# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00687-COA

**JERRARD T. COOK A/K/A JERRAD T. COOK**        **APPELLANT**
**A/K/A JERRARD COOK A/K/A JERRARD**
**TRAMAINE COOK A/K/A J-FAT**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2016 |
| TRIAL JUDGE: | HON. DAVID H. STRONG JR. |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 08/08/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., WILSON AND WESTBROOKS, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Jerrard Cook shot and killed Marvin Durr during a robbery. Durr was eighteen years old at the time of his death. Cook was seventeen years old at the time of the offense. Cook's accomplice, Cearic Barnes, was eighteen years old. Cook shot Durr in the head while Durr was seated in the driver's seat of his car. He shot Durr because he and Barnes wanted to use Durr's car to commit a robbery. However, Cook and Barnes were unable to remove Durr's body from the car, so Cook sat on top of Durr's body and drove the car to an isolated location. To destroy evidence, Barnes then set fire to the car.

¶2.     Cook was arrested, confessed, and pled guilty to capital murder, and the circuit court imposed a mandatory sentence of life imprisonment. Cook's conviction for capital murder rendered him ineligible for parole. Miss. Code Ann. § 47-7-3(1)(f) (Rev. 2015).[1] Several years later, in *Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012), the United States Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." The Court held that the sentencer must have the "discretion" to "consider mitigating circumstances" before a sentence of life without the possibility of parole (LWOP) may be imposed in cases in which the defendant was under the age of eighteen at the time of the offense. *Id.* at 2475.

¶3.     The circuit court appointed counsel to represent Cook and held a new sentencing hearing to consider the factors discussed in *Miller*. After considering the testimony and other evidence presented, the judge found that Cook was not entitled to parole eligibility under *Miller*. On appeal, Cook argues (1) that the circuit court erred by not granting him parole eligibility, (2) that he should have been resentenced by a jury rather than a judge, and (3) that a sentence of LWOP is unconstitutional in all cases in which the offender is under the age of eighteen at the time of the offense. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶4.     On the evening of June 18, 2002, Cook, Barnes, and Eric Williams were walking

---

[1] Barnes later pled guilty to murder and is also serving a life sentence. *See Barnes v. State*, 51 So. 3d 986, 988 (¶2) (Miss. Ct. App. 2010), *cert. denied*, 50 So. 3d 1003 (Miss. 2011). He is also ineligible for parole.

together in Brookhaven. Cook had a gun, which he had obtained when he broke into his uncle's house a few days earlier. Cook and Barnes wanted some money. Cook later said he needed money to get his car fixed and could not find a job. So the three young men decided to rob a convenience store. Cook and Barnes planned to go into the store and commit the robbery, while Williams would remain outside as the lookout. Cook and Barnes had masks to wear during the robbery. However, the first store they planned to rob was closed. They planned to rob a second store, but Cook decided there were too many customers present. Eventually, Williams went home, leaving Cook and Barnes.

¶5.    Cook and Barnes then decided that they would flag down a car and ask for a ride, carjack the car, and drive to McComb to rob a store. Cook and Barnes wanted to rob a store in McComb because they thought that they were less likely to be recognized there. The first car that Cook flagged down turned out to be a police car. Cook and Barnes spoke briefly to the police officer, and the officer drove on without incident.

¶6.    Durr, who was Barnes's cousin, was driving the next car that Cook flagged down. Cook and Barnes asked Durr to give them a ride to Cook's aunt's house, and Durr agreed. Cook and Barnes gave Durr incorrect directions and caused him to miss the turn to Cook's aunt's house. They then told Durr that he could let them out along South Washington Street in Brookhaven. Cook and Barnes exited the car, and as Durr turned around on South Washington Street, Cook flagged him down again and walked up to the driver's side window to speak. Cook then shot Durr in the left temple from a distance of an inch or two. Cook

later told law enforcement that Durr "was just at the wrong place at the wrong time." Cook also said that Durr "was like the weak type," and he could have taken the car from Durr "without using a gun." Nonetheless, Cook shot Durr in the head.

¶7. Cook and Barnes then attempted to pull Durr's body from the car, but they were unable to do so. So Cook sat on top of Durr's body and drove the car to a bridge. It was Cook's idea to "[d]ump [Durr's] body under the bridge" because he knew there were "alligators" under the bridge. However, again, Cook and Barnes were unable to remove Durr's body from the car. Cook then went through Durr's pockets but did not find much money. Using a lighter, Barnes then set fire to the car to destroy evidence. Cook later told investigators that he thought that Durr was still alive when they set the car on fire. Cook stated that as he was sitting on top of Durr, he felt Durr "move" and just "had a feeling he wasn't dead." Nonetheless, Barnes set the car on fire, and then he and Cook fled into the woods. Cook discarded his gun in the woods, and Barnes later burned their clothes in order to destroy evidence.

¶8. Cook and Barnes were indicted for capital murder. Cook pled guilty to capital murder and was sentenced to life imprisonment. His conviction makes him ineligible for parole. *See* Miss. Code Ann. § 47-7-3(1)(f). Barnes later pled guilty to murder, was sentenced to life imprisonment, and is also ineligible for parole. *See Barnes v. State*, 51 So. 3d 986, 988 (¶2) (Miss. Ct. App. 2010).

¶9. In 2012, the United States Supreme Court held "that the Eighth Amendment forbids

4

a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 132 S. Ct. at 2469. The Court held that the sentencer must have the "discretion" to "consider mitigating circumstances" before a sentence of LWOP may be imposed. *Id.* at 2475. In *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Court clarified or expanded *Miller*'s holding. There, the Court stated that a sentence of LWOP is valid only for "those rare children whose crimes reflect irreparable corruption." *Id.* at 734. According to the Court, the Eighth Amendment mandates parole eligibility for juvenile murderers "whose crimes reflected only transient immaturity." *Id*. at 736. Also, in *Parker v. State*, 119 So. 3d 987, 995-99 (¶¶18-28) (Miss. 2013), our Supreme Court summarized the factors to be considered and procedure to be followed in cases in which *Miller* requires a new sentencing hearing.

¶10. Post-*Miller*, Cook filed a motion to be resentenced and granted parole eligibility pursuant to *Miller*. The circuit court appointed counsel to represent Cook and appointed Dr. Criss Lott, Ph.D., to conduct a mental evaluation of Cook. The court denied Cook's motion to have a jury determine whether he should be parole eligible.

¶11. On March 30, 2016, the circuit court held a hearing to determine whether Cook should be declared parole eligible pursuant to *Miller*. The State called the former district attorney, Brookhaven Chief of Police Bobby Bell, and Durr's father, Reverend Jerry Durr. The former district attorney testified about the murder and its investigation. Chief Bell testified that he mentored Cook when Cook was about thirteen years old; however, he lost touch with Cook

5

thereafter. Reverend Durr testified that Cook attended youth events at his church until he was about twelve years old and that Cook generally was a respectful child; however, like Chief Bell, Reverend Durr had not been around Cook for several years prior to the murder.

¶12. The parties also stipulated to the admission of a number of exhibits, including transcripts of recorded statements that Cook, Barnes, and Williams gave to law enforcement; Cook's school records and prison records; and Dr. Lott's report. Cook's prison records show that he has been the subject of twenty-nine rule violation reports (RVRs) during his incarceration, including for assaulting a corrections officer, threatening a corrections officer, possessing a shank, using and possessing marijuana, and possessing a cell phone. Cook's school records show that he attended Oakley Training School (now known as Oakley Youth Development Center) from October 2001 to March 2002. Cook told Dr. Lott that the youth court sent him to Oakley because two friends asked him to drive them to a store, the friends robbed the store, and he was arrested for conspiracy to commit armed robbery.

¶13. Cook's cousin Angela Daniels testified on his behalf. She testified that Cook had no relationship with his father and was raised by his mother and grandmother. Daniels described Cook as a "typical child," "always . . . smiling." She testified that Cook started to get into trouble as a teenager, and she became concerned that he was smoking marijuana and skipping school. Daniels believed that Cook had "matured a lot" since 2002.

¶14. Reverend Bruce Smith testified that Cook attended his church as a child. Reverend Smith remembered Cook as "always joking and jovial." Reverend Smith also testified that

6

Cook seemed immature for his age at seventeen. Reverend Smith believed that Cook had matured since the murder; however, he had only visited Cook twice in prison.

¶15. Cook's mother, Sharon, testified that Cook did not have a relationship with his father, who went to prison soon after Cook was born. Sharon testified that when Cook was younger, she used drugs and went out to clubs and frequently worked two jobs. As a result, Cook's grandmother played a significant role in raising him, and they were very close. Cook was devastated when his grandmother passed away when he was twelve years old. Although Sharon was gone a lot, she testified that she always provided for Cook. Cook always had clothes and food, and she "[b]ought him anything he wanted," including a car. There was no evidence or suggestion that Cook was abused or neglected as a child.

¶16. Sharon testified that Cook's crime was "out of his character." She thought that he "didn't understand the consequences" of his actions. To illustrate, Sharon testified that Cook was doing pushups when she visited him in jail after the murder. Sharon thought this showed that Cook believed that he would be getting out of jail soon. Sharon testified that Cook had changed and was more mature than he was in 2002. She also thought that he was remorseful.

¶17. Cook's fiancee, Vera Quarles, testified that she knew Cook for several years prior to the murder and was "shocked" or "surprised" when she heard about it. She did not believe that Cook understood the consequences of his actions because she went to visit him in jail before he pled guilty, and he asked her on a date, as if he thought he would be released soon. Quarles and Cook did not date prior to the murder, but they reconnected in 2014 and later

became engaged. Quarles thought that Cook was more mature than he was in 2002.

¶18. Dr. Lott testified as an expert witness in clinical and forensic psychology. Dr. Lott performed a mental evaluation of Cook, with particular attention to the factors discussed in *Miller*. Dr. Lott testified that Cook was cooperative during their interview. He described Cook as having average to low-average intelligence. He noted that Cook had been an average student and probably could have done better in school. Dr. Lott testified that he "didn't see anything with [Cook's] case that . . . indicated that he was well outside the adolescent norm." Dr. Lott also testified that "the first years of [Cook's] life appear to [have been] fairly normal" despite his father's absence and his mother's drug use. With respect to issues of maturity, Dr. Lott testified that it appeared that Cook was a "normal, typical" seventeen year old at the time of the offense.

¶19. Dr. Lott opined that the murder appeared to have been committed in a way that "was almost haphazard." Dr. Lott testified that studies have shown that ninety to ninety-five percent of violent juvenile offenders "do not reoffend" as adults. Dr. Lott had not seen "any data . . . to suggest" that Cook was the sort of "rare" offender who warranted a sentence of LWOP under *Miller*. However, Dr. Lott said that was just "[his] impression" and that he could not "state it with certainty." Dr. Lott testified that psychologists "can't distinguish between those [offenders] who commit an offense at sixteen, seventeen, and what they're going to be like at [twenty-seven] or [thirty-seven]." He acknowledged that "[n]o one can do that with any degree of certainty"—no "mental health professional has a crystal ball and

can determine what somebody will be like in [twenty] years."[2]

¶20.    On April 1, 2016, the circuit court entered an order denying Cook's request for parole eligibility. The court addressed the factors discussed in *Miller* and *Parker* and found that there were no mitigating circumstances that mandated parole eligibility. Cook filed a timely motion for reconsideration, which was denied, and a timely notice of appeal.

**DISCUSSION**

¶21.    On appeal, Cook, through appointed counsel from the Indigent Appeals Division of the Office of State Public Defender, argues (1) that he should be declared eligible for parole under *Miller* and *Parker*, (2) that he was entitled to a jury determination of his sentence, and (3) that the Eighth Amendment to the United States Constitution and Article 3, Section 28 of the Mississippi Constitution categorically prohibit a sentence of LWOP when the offender was under the age of eighteen at the time of the offense. We address these issues in turn.

> I.      *The circuit judge did not abuse his discretion by declining to declare Cook parole eligible.*

¶22.    In *Miller*, the United States Supreme Court stated, "[W]e think appropriate occasions for sentencing juveniles to [LWOP] will be uncommon." *Miller*, 132 S. Ct. at 2469. The Court said that this sentence would only be appropriate for "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)). Cook argues that the circuit judge erred by declining to grant him parole eligibility

---

[2] Cook also subpoenaed Steven Pickett, the chairman of the State Parole Board, to testify at the hearing. However, Pickett had no personal knowledge of Cook's case.

because he is not such an "uncommon" or "rare" offender.

¶23. As this Court has held on two prior occasions, we review a circuit judge's sentencing decision under *Miller* only for an abuse of discretion. *Hudspeth v. State*, 179 So. 3d 1226, 1228 (¶12) (Miss. Ct. App. 2015); *Davis v. State*, 2016-CA-00638-COA, 2017 WL 2782015, at*2 (¶8) (Miss. Ct. App. June 27, 2017). Cook argues that we should apply "heightened scrutiny," as in a death penalty case. *See, e.g.*, *Byrom v. State*, 863 So. 2d 836, 846 (¶9) (Miss. 2003). Neither this Court nor the Mississippi Supreme Court has ever held that appeals from *Miller* hearings are subject to "heightened scrutiny," and we decline to do so now. Moreover, even in a capital case, it does not appear that any sort of "heightened scrutiny" or de novo review is applied to the circuit judge's or jury's ultimate finding that the death penalty is the appropriate sentence.[3]

¶24. This Court is in no position to conduct a de novo, appellate resentencing of the offender. Nor would it be appropriate for us to substitute our own collective view of an appropriate sentence for the considered judgment of the circuit judge, who listened to and

---

[3] *See Byrom,* 863 So. 2d at 881-83 (¶¶164-71) (affirming sentence of death because "sufficient evidence existed to support the finding" of an aggravating factor, "the trial judge clearly *considered* all the mitigating circumstances," and the sentence was not "imposed under the influence of passion, prejudice or any other arbitrary factor" and was "not disproportionate"); *Bishop v. State*, 812 So. 2d 934, 948 (¶45) (Miss. 2002) ("When the sufficiency of the evidence [of facts necessary to support the death penalty] is challenged, we must view the evidence and all reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the verdict short of a conclusion that no rational trier of fact could have found the fact at issue beyond a reasonable doubt.").

observed the demeanor of the witnesses at sentencing and the offender himself, looked the offender in the eye, and imposed what he adjudged to be a just sentence. Rather, our standard of review is abuse of discretion, as it is in other appeals in which a sentence is alleged to be excessive. *See, e.g.*, *Reynolds v. State*, 585 So. 2d 753, 756 (Miss. 1991); *Carter v. State*, 450 So. 2d 67, 69 (Miss. 1984); *May v. State*, 435 So. 2d 1181, 1184 (Miss. 1983).

¶25. Cook next argues that the circuit judge failed to "acknowledge" that *Miller* and *Montgomery* have established a "presumption against" a sentence of LWOP in all cases in which the offender was under the age of eighteen at the time of the offense. In support of this argument, Cook relies on the Connecticut Supreme Court's opinion in *State v. Riley*, 110 A.3d 1205, 1214 (Conn. 2015). *But see id.* at 1222 (Espinosa, J., dissenting) (rejecting the suggestion that *Miller* established such a "presumption"). However, our own Supreme Court has indicated that no such presumption exists. In *Jones v. State*, 122 So. 3d 698, 702 (¶14) (Miss. 2013), our Supreme Court stated that a sentence of LWOP remains appropriate for "juveniles who *fail to convince the sentencing authority* that *Miller* considerations are sufficient to prohibit its [imposition]." (Emphasis added). Thus, *Jones* places the burden on the offender to persuade the judge that he is entitled to relief under *Miller*. We are bound to follow the decision of the Mississippi Supreme Court in *Jones*.

¶26. We now consider whether the circuit judge abused his discretion by finding that Cook was not eligible for parole under *Miller*. We begin by acknowledging that the United States

Supreme Court has given the sentencing judge in a *Miller* case a difficult, if not impossible, task. According to the Supreme Court, the judge is supposed to determine whether the offender's "crimes reflected *only* transient immaturity" or instead "reflect irreparable corruption." *Montgomery*, 136 S. Ct. at 736 (emphasis added). Apparently, there are only two possibilities: either the murder reflects only youthful immaturity, or else the offender is irreparably corrupt. We note that there probably are few murders that "reflect[] *only* transient immaturity" and nothing else, a description that seems to effectively absolve the offender of culpability. We also note that the United States Supreme Court has never defined "irreparable corruption," a term that sounds more like a theological concept than a rule of law to be applied by an earthly judge.

¶27. With these observations, *Miller* and our Supreme Court's decision in *Parker* do identify some factors that the judge is supposed to consider in reaching a sentencing decision. Thus, the judge in a *Miller* case is bound to consider and apply these factors in a non-arbitrary fashion. If the offender persuades the judge that the *Miller* factors preponderate in favor of parole eligibility, then the judge must declare the offender parole eligible. *Parker*, 119 So. 3d at 999 (¶28).[4] If, however, the judge determines that *Miller* does not mandate parole eligibility, then the judge *must* deny relief because the Legislature has provided by law

---

[4] As we recently stated, *Miller* "obviously 'is binding on the tribunals and citizens of the respective states in comparable cases.'" *Mason v. State*, 2015-CP-00523-COA, 2017 WL 2335516, at *3 n.2 (Miss. Ct. App. May 30, 2017) (quoting *Bolton v. City of Greenville*, 178 So. 2d 667, 672 (Miss. 1965)).

12

that persons convicted of murder are not eligible for parole. *See* Miss. Code Ann. § 47-7-3(1)(f); *Stromas v. State*, 618 So. 2d 116, 123 (Miss. 1993) ("It is the [L]egislature's prerogative, and not this Court's, to set the length of sentences.").

¶28. In *Parker*, our Supreme Court made clear that "*Miller* does not prohibit sentences of life without parole for juvenile offenders. Rather, it 'requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Parker*, 119 So. 3d at 995 (¶19) (quoting *Miller*, 132 S. Ct. at 2469). As the *Parker* Court explained, *Miller* "identified several factors" that the "sentencing authority" must consider before sentencing a juvenile offender to LWOP:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id.* at 995-96 (¶19) (quoting *Miller*, 132 S. Ct. at 2468).

¶29. The circuit judge addressed these factors in his order denying relief. As to chronological age, the judge noted that Cook was seventeen years and two months old when

13

he murdered Durr. The judge reasoned that Cook "was sufficiently close to his eighteenth birthday that this factor should not weigh against the imposition of a sentence of [LWOP]." In addition, we note that Barnes was only one year older than Cook, and although he did not pull the trigger, he also received an effective sentence of LWOP.

¶30. As to maturity or immaturity, the judge noted that the evidence did not show that Cook "was especially immature for his age." Dr. Lott testified that Cook was of average intelligence and well within the normal range of maturity for a seventeen year old.

¶31. As to impetuosity, the judge found that there was "no evidence of impetuosity in this case." Rather, "the plan to take the victim's vehicle was just that, a plan." The judge also found that "[t]he crime was premeditated" and that Cook stole the gun from his uncle "for the purpose which he accomplished." The judge's findings are supported by substantial evidence. We also note that Cook and Barnes were presented with repeated opportunities to abandon their plans: The first store they planned to rob was closed, and there were too many customers at the second store. Cook then flagged down a car to rob, but it turned out to be a police car. That was no deterrent. Cook simply flagged down the next driver, which turned out to be Barnes's cousin. Even after Durr gave them a ride and Cook and Barnes exited the car without incident, Cook decided to shoot Durr in the head and take his car. After the crime was committed, Cook and Barnes went to great lengths to try to cover their tracks and destroy evidence. The circuit judge did not abuse his discretion by finding that this factor did not weigh in favor of parole eligibility under *Miller*.

14

¶32.    The court next found "that there ha[d] been little, if any, proof of [Cook's] failure to appreciate risks and/or consequences of his actions." The court did not find it significant that Cook was doing pushups in his jail cell when his mother came to visit him. The court also noted that Cook's and Barnes's efforts to cover their tracks suggested an awareness of the consequences. There is substantial evidence to support the circuit judge's finding that this factor did not weigh in favor of parole eligibility under *Miller*.

¶33.    With respect to Cook's "family and home environment," the judge acknowledged that Cook grew up in a broken, single-parent home because of his father's imprisonment and that Cook's mother struggled with drugs. However, the judge also noted that Cook's "mother took care of him in spite of her battles with drug addiction." The judge found that Cook "always had decent clothing as well as computer games, a go cart and later an automobile." There was no suggestion or evidence that Cook was ever abused or neglected. Also, Chief Bell was willing to serve as a mentor to Cook. The court found that although Cook "did not enjoy an ideal childhood," this factor did not indicate that he should be granted parole eligibility. This was not an abuse of discretion. Cook's family and home environment was not a mitigating factor comparable to the backgrounds of the fourteen-year-old offenders discussed in *Miller*, 132 S. Ct. at 2468-69.

¶34.    The circuit judge next found that the "circumstances of the homicide offense," including the extent of Cook's participation and any familial or peer pressures, did not weigh in favor of parole eligibility. As the judge noted, there is no question that Cook pulled the

15

trigger, and there was no pressure from his family to commit a crime. While Dr. Lott suggested that there might have been peer pressure, there was no evidence that Barnes or anyone else pressured Cook into murdering Durr. The judge reasoned that, if anything, Cook, Barnes, and Williams all encouraged one another in their violent, criminal plans. We find no abuse of discretion in this aspect of the circuit judge's decision. As discussed above, Cook admitted that he shot Durr in the head because he wanted to use Durr's car to commit an armed robbery, and Cook then went to great lengths to destroy the evidence.

¶35.    Finally, the judge considered the "possibility of rehabilitation." The judge discussed Cook's numerous RVRs while incarcerated and did "not find any significant possibility of rehabilitation." There was no abuse of discretion in this finding. As discussed above, Dr. Lott testified only that it was his "impression" that he had not seen "any data . . . to suggest" that Cook was the type of allegedly "rare" juvenile offender who will commit additional violent crimes as an adult. However, Dr. Lott conceded that he could not make that prediction "with any degree of certainty." He also acknowledged that psychologists really "can't distinguish between" offenders who will reoffend and those who will not. At the end of the hearing in the circuit court, Cook spoke very briefly "in allocution." Although he "ask[ed] for forgiveness from the Durr family," he did not provide any additional testimony or evidence to demonstrate that rehabilitation was likely.

¶36.    In addition to the circuit judge's findings, we note that there is no evidence to suggest that the crime should have been charged as a lesser offense. Cook was clearly guilty of the

16

capital offense to which he pled. *See Miller*, 132 S. Ct. at 2468 (suggesting consideration of whether the offender "might have been charged and convicted of a lesser offense"). Also, from the standpoint that proportionality in sentencing is desirable, we again note that Barnes was only one year older than Cook, and although he did not pull the trigger, he also received an effective sentence of LWOP.

¶37. Our standard of review is abuse of discretion. The circuit judge in this case discussed and applied the correct legal standard, i.e., the relevant factors outlined in *Miller* and *Parker*. In addition, the judge's findings and reasoning are supported by substantial evidence and are not arbitrary or capricious. Even in sentencing a juvenile offender, a judge should consider that retribution and deterrence are proper purposes of sentencing. *See Taggart v. State*, 957 So. 2d 981, 994 (¶31) (Miss. 2007). On the facts of this case, we cannot say that the judge abused his discretion by declining to declare Cook eligible for parole.

      *II.    Cook was not entitled to be resentenced by a jury.*

¶38. Cook next argues that he has a "constitutional right to have his sentence determined by a jury." He reasons that he is entitled to parole eligibility unless the sentencer finds that his offense reflects "irreparable corruption." *Montgomery*, 136 S. Ct. at 734. And he relies on the principle that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Cook argues that, when read in conjunction with the *Apprendi* line of cases, *Miller* and

17

*Montgomery* establish a constitutional right to jury resentencing. We disagree.

¶39. The *Miller* and *Montgomery* opinions refute Cook's argument. *Miller* held that "a *judge* or jury must have the opportunity to consider mitigating circumstances before imposing" the sentence of LWOP in the case of a juvenile offender. *Miller*, 132 S. Ct. at 2475 (emphasis added). And in *Montgomery*, the Court stated, "*Miller* requires that before sentencing a juvenile to [LWOP], the sentencing *judge* [must] take into account" certain potentially mitigating factors. *Montgomery*, 136 S. Ct. at 733 (emphasis added). Moreover, in *Montgomery*, the Court specifically stated that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility" and that "*Miller* did not impose a formal factfinding requirement." *Id.* at 735.

¶40. It may be that "irreparable corruption" is not considered an objective, provable "fact" for purposes of *Apprendi*. Or it may be that *Apprendi* does not apply because "irreparable corruption" is something that a defendant must disprove in order to mitigate his punishment, rather than something the State must prove in order to increase the penalty. Whatever the reason, unless the United States Supreme Court's opinions in *Miller* and *Montgomery* do not mean what they specifically say—that a judge may sentence the offender to LWOP—Cook does not have a constitutional right to be resentenced by a jury.

¶41. In support of his argument, Cook also cites an unpublished order entered by a panel of the Mississippi Supreme Court. *Dycus v. State*, 2012-M-02041 (Sept. 17, 2014). Dycus was convicted and sentenced to death following a jury trial. He was later resentenced to

18

LWOP after the United States Supreme Court prohibited the imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed. *See Roper*, 543 U.S. at 578. Post-*Miller*, Dycus filed a motion in the Mississippi Supreme Court again requesting resentencing. In a two-page order, a three-justice panel ordered a "new sentencing hearing before a jury under [Mississippi Code Annotated] section 99-19-101," the general statute governing sentencing and the imposition of the death penalty in capital cases. The *Dycus* order provides no further explanation as to why the hearing was to be "before a jury" rather than a judge alone.

¶42.    We do not believe that the unpublished order in *Dycus* is controlling or applicable to this case. To begin with, the unpublished panel order has no precedential value. *Westbrook v. City of Jackson*, 665 So. 2d 833, 837 n.2 (Miss. 1995); *see also Miss. Transp. Comm'n ex rel. Moore v. Allday*, 726 So. 2d 563, 566-67 (¶13) (Miss. 1998) (McRae, J., dissenting) ("[O]ur unpublished orders and opinions are of no precedential value[.]").

¶43.    In addition, *Dycus* is distinguishable in that Dycus originally was convicted and sentenced by a jury, which was perhaps a reason that he should be resentenced by a jury. In contrast, Cook pled guilty. When he pled guilty, Cook waived his right to a jury trial and confirmed that he understood that he would be sentenced by the judge. He did so in writing and under oath. Section 99-19-101(1) (Rev. 2015) provides that a sentencing proceeding in a capital case "may be conducted before the trial judge sitting without a jury if both the State . . . and the defendant agree thereto in writing."

19

¶44. Finally, section 99-19-101 does not grant Cook a right to a jury in a "*Miller* hearing." A *Miller* hearing is a specialized proceeding that is required solely because the United States Supreme Court's decision in *Miller* decreed it. It is a judicial invention. In such a proceeding, the sentencer is supposed to consider the offender's age, characteristics sometimes associated with youth, the offender's family and home environment, the possibility of rehabilitation, and the facts and circumstances of the crime. *See generally Parker*, 119 So. 3d at 995-96 (¶19) (quoting *Miller*, 132 S. Ct. at 2468). The hearing required by section 99-19-101, in contrast, is a statutory procedure established by the Legislature in the exercise of its authority to set sentences for criminal offenses. *See Stromas*, 618 So. 2d at 123. The statute identifies certain aggravating circumstances and mitigating circumstances for the jury to consider. The statutory factors overlap with the *Miller* factors, but they are not the same. On its face, section 99-19-101 does not apply to *Miller* hearings. Absent some further direction from the Legislature, we see no reason to interpret section 99-19-101 to require juries in *Miller* hearings.

### III. *Cook's sentence is not unconstitutional.*

¶45. Finally, Cook urges this Court to hold that the United States Constitution and the Mississippi Constitution "categorically prohibit imposing [LWOP] sentences on juveniles." However, the United States Supreme Court has declined to announce such a categorical rule. *Miller*, 132 S. Ct. at 2463. The Mississippi Supreme Court has also recognized that "*Miller* does not prohibit sentences of [LWOP] for juvenile offenders." *Parker*, 119 So. 3d at 995

20

(¶19). Rather, a defendant sentenced to life imprisonment is ineligible for parole unless he "convince[s] the sentencing authority that *Miller* considerations" require parole eligibility. *Jones*, 122 So. 3d at 702 (¶14). Moreover, the Legislature has effectively mandated a minimum sentence of LWOP for the offense of capital murder. "It is the [L]egislature's prerogative, and not this Court's, to set the length of sentences." *Stromas*, 618 So. 2d at 123. "Declaring a sentence violative of the Eighth Amendment to the U.S. Constitution carries a heavy burden and only in rare cases should this Court make such a finding." *Id.* We decline to hold that a defendant convicted of capital murder has an absolute constitutional right to be considered for parole.

## CONCLUSION

¶46. The circuit judge did not abuse his discretion or otherwise err in declining to declare Cook parole eligible. Cook's sentence does not violate the United States Constitution or the Mississippi Constitution. Therefore, we affirm.

¶47. **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. IRVING, P.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**