# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01086-COA

**DUNTA DOTSON A/K/A DUNTA D. DOTSON**                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/31/2019 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: STACY FERRARO THOMAS M. FORTNER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART KRISSY CASEY NOBILE |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/23/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1. On January 4, 2005, Dunta Dotson, his younger brother Robert Dotson, and Eugene Ealy were indicted for the capital murder of Robert Jeanes. The crime occurred on October 26, 2004. Dunta was fifteen years old on the date of the crime. On July 26, 2006, Dunta pleaded guilty to the lesser-included offense of murder and was sentenced to life imprisonment without eligibility for parole (life without parole), which was the only available statutory sentence. After the United States Supreme Court held in *Miller v. Alabama*, 567 U.S. 460 (2012), that mandatory life-without-parole sentences for juveniles

are unconstitutional, Dunta filed a motion to vacate his mandatory life-without-parole sentence pursuant to *Miller*. The circuit court granted post-conviction relief, vacated Dunta's sentence, held a sentencing hearing as mandated by *Miller*, and resentenced Dunta to life without parole. Dunta appeals. For the reasons addressed below, we find no error and, therefore, affirm the circuit court's ruling that Dunta is not entitled to relief under *Miller* and the court's sentence of life without parole.[1]

## FACTS AND PROCEDURAL HISTORY

¶2. On October 26, 2004, fifteen-year-old Dunta Dotson, his thirteen-year-old younger brother, Robert Dotson, and Dunta's friend, Eugene Ealy, drove from Jackson, Mississippi, to Madison County, Mississippi, to steal a four-wheeler. Dunta and Ealy had stolen cars and four-wheelers in the past. On this day they had been looking for four-wheelers to steal in the Madison County area, and Ealy noticed a home with a four-wheeler in the back of a truck and a white Cadillac in the driveway. Dunta and Ealy went back to Dunta's home and got his younger brother, Robert, to be a third driver, and then the three of them went back to the home.

¶3. When they arrived back at the home and parked, Robert stayed in the truck, and Dunta

---

[1] As addressed below, we also deny, without prejudice, Dunta's motion to stay his appeal pending a decision by the United Supreme Court in *Jones v. Mississippi*, No. 18-1259. The issue before the United States Supreme Court in *Jones* is whether the Eighth Amendment to the United States Constitution requires a finding that a juvenile offender is "permanently incorrigible" before a life-without-parole sentence can be imposed. Dunta may seek a stay of the deadline to file a motion for rehearing.

and Ealy knocked on the door. Dunta was carrying a gun that he said Ealy had given him. He said he carried the gun to the robbery because "I guess was it just a social norm at the time." When Dunta and Ealy got to the door of the home, Ealy knocked, Robert Jeanes answered, and Ealy asked Jeanes if he could use his phone. Jeanes obliged. While Ealy was using the phone pretending to find an address, Dunta shot Jeanes in the head. Dunta admitted that the shooting was unprovoked. According to Dunta, he did not intend to kill Jeanes. On the day of the crime, he and Ealy were planning on stealing four-wheelers. In describing the crime, Dunta explained that "[i]t wasn't never even planned. We was just out stealing four-wheelers. It was never planned to even kill Mr. Jeanes." The record reflects that Dunta admitted that earlier that day Ealy said they would need to kill Jeanes after robbing him "because [a] dead man don't talk."

¶4. With Jeanes's body in the doorway, Dunta and Ealy entered the home and stole firearms, a television, and a chainsaw. They got the keys for both of Jeanes's vehicles. Dunta drove Jeanes's Cadillac back to Jackson, Ealy drove Jeanes's truck with the four-wheeler in the back, and Robert drove the stolen truck they had arrived in. Dunta turned himself in to the police. He admitted that because he was scared, he originally lied to police and said Ealy had killed Jeanes.

¶5. A Madison County grand jury indicted Dunta for capital murder under Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2004). On July 26, 2006, Dunta pleaded guilty to murder as a lesser-included offense of capital murder under Mississippi Code Annotated

3

section 97-3-21 (Rev. 2004). The Madison County Circuit Court sentenced Dunta to serve life in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. This was the only possible sentence the circuit court could impose because section 97-3-21 required a life sentence for murder, and Mississippi Code Annotated section 47-7-3(1)(f) (Rev. 2004) precluded parole eligibility for those convicted of violent crimes between June 30, 1995, and July 1, 2014.

¶6. On May 26, 2013, Dunta filed a motion for post-conviction relief, seeking to vacate his sentence based on the United States Supreme Court's decision in *Miller*. The motion was granted, and the Madison County Circuit Court vacated Dunta's sentence for resentencing under *Miller* and *Parker v. State*, 119 So. 3d 987 (Miss. 2013) (applying *Miller*). After several agreed continuances, the circuit court conducted the *Miller* sentencing hearing in May 2019.

¶7. At the hearing, Dunta presented the testimony of forensic and clinical psychologist Criss Lott. A person named Susan Guness also testified. She is a volunteer from an organization that she co-founded, Angels By Your Side, which helps people in need with resources, including offering them encouragement and assistance with employment and housing. Dunta testified on his own behalf. The State presented the testimony of Lieutenant Don Hicks. The hearing concluded with the victim impact statements of Kenneth and Mike Jeanes, the victim's brothers.

¶8. Dr. Lott was accepted and admitted as an expert in the field of forensic and clinical

psychology. He addressed general principles about the adolescent brain and also how the *Miller* factors applied to Dunta. Dr. Lott noted that Dunta was fifteen-years and three-months old at the time of the crime. Dr. Lott testified that in general, because of immature brain development, "when [adolescents] are emotionally stressed or threatened, we see significant deficits in their judgment and behavior." He also testified about what is known as "a maturity gap," explaining that it is significant beginning from the age of around fourteen and up until an adolescent's mid-twenties. Continuing, Dr. Lott explained that "adolescents in general . . . are much more likely to exhibit an auto-emotional and impulsive behavior due to a largely overactive emotional system without significant cognitive control due to that lack of development in their prefrontal cortex of the brain."

¶9. Applying these principles to Dunta, Dr. Lott testified he saw these characteristics in Dunta, noting that at the time of the crime, Dunta and his family had moved to a new neighborhood in Jackson, Mississippi. Dunta then started "to engage in and affiliate with other at-risk teens" and was affected by "peer influence." Dr. Lott clarified that "it's not peer pressure. It's just peer influence I think in his case."

¶10. Dr. Lott testified that Dunta's family and home environment was mostly positive. Regarding the circumstances of the crime, in Dr. Lott's opinion, "[Dunta's crime] represented more of an impulse homicide and not a premeditated malevolent, vicious attack on someone." Dr. Lott described the crime as "a transient adolescent act" and went on to say, "This was a tragic[—]very tragic act, but it was transient in nature." Dr. Lott observed that

5

prior to the murder, Dunta had been "engaging in a number of adolescent offender behaviors [such as] . . . stealing [four]-wheelers [and other things] . . . , but [Dunta and Ealy] had not been involved in that kind of behavior; that is, taking a weapon and threatening someone with it or shooting someone with a weapon." On cross-examination, Dr. Lott acknowledged that Dunta had been charged with aggravated assault when he was thirteen in an incident in which his mother's boyfriend gave him a shotgun, and he shot it at another boy who had taken Dunta's bike. Dr. Lott explained that the charges were dropped.

¶11. Dr. Lott also addressed the possibility of rehabilitation in Dunta's case. He explained that Dunta "is of average IQ," "has engaged in prosocial behaviors when possible," and has "a significant support system" that includes "individuals here and in Texas that are willing to provide room, shelter, and employment for him." He also discussed some of Dunta's rehabilitative efforts during the fourteen years he spent in prison prior to his new sentencing hearing, including obtaining his GED, working as a barber, as well as receiving an award for honor roll in 2008 and a certificate for good behavior in 2007. Dunta also completed a number of rehabilitative programs.

¶12. Dr. Lott also discussed Dunta's capacity for rehabilitation in his written report, which was admitted into evidence. In the report, Dr. Lott explained:

> While Mr. Dotson had a history of negative influences and factors, he also has a number of protective and promotive factors, including his intellectual ability, . . . his positive peer relations throughout his childhood and since his incarceration, and the skills he has developed since his incarceration.
>
> Mr. Dotson clearly exhibited a history of poor judgment, impulse control and

6

substance abuse as an adolescent, but he appears to have matured since his incarceration. His correctional records also indicated no mental health concerns . . . .

He was administered personality testing and the testing indicated that he had a history of conduct problems as a juvenile. There was no evidence of any current psychopathology, and he did not appear to have any significant psychopathic personality traits.

Mr. Dotson received six RVRs after the first three years of his incarceration for nonviolent offenses (being in another inmate[']s cell, receiving $60 after a visit, possession of tobacco products and smoking in his cell, tampering with his cell door so it would not secure, defacing of state property with a value of less than $100 by having a toreup mattress, and possession a cell phone inside his mattress).

. . . .

In sum, it is my opinion, to a reasonable degree of psychological certainty, that Mr. Dotson does not appear to represent one of those "rare" and "uncommon" offenders who are incapable of being rehabilitated and thus are irredeemably incorrigible, and he has already exhibited the potential for successful rehabilitation while in prison. He also has significant family and community support and he would likely continue to be function in a prosocial manner in the community if he is given the opportunity.

In the sentencing hearing, when asked whether he had "any reason to conclude in this case that [Dunta] fits into that *Miller* definition of irreparably corrupt," Dr. Lott responded, "No. He has the potential to . . . participate in society . . . in a reasonable manner and become a productive individual."

¶13. Dunta also testified at the sentencing hearing. Dunta said that he had known Ealy for several months before the murder and that they would steal four-wheelers and cars whenever they got together. "On and off" he would carry a gun on these robberies. When asked why

7

he would carry a gun during these robberies, he responded, "[I] guess was it just a social norm at the time." Dunta also described the circumstances of the crime, as set forth above. He said that Ealy gave him the gun that he was carrying on the day of the murder. Dunta admitted that he shot and killed Jeanes, but he said he did not intend to do so. Dunta explained that he and Ealy only intended to steal four-wheelers. As noted above, Dunta turned himself in to the police, and although he initially told the police that Ealy killed Jeanes, he later confessed to the crime.

¶14. Dunta also described the incident in which he was charged with aggravated assault when he was thirteen and still living in Clinton, Mississippi. Some boys had taken his bike at a park, and when he went home to tell his mother, her boyfriend went back with him to the park, carrying a shotgun. The boys ran off when they saw Dunta and his mother's boyfriend, and his mother's boyfriend gave Dunta the shotgun. Dunta shot toward the boys, and one was hit with the "bird shot" from the shotgun. The boy's injuries were not serious. Dunta was arrested that day and jailed for about three weeks. He was released when the aggravated assault charges were later dropped after the victim's mother decided not to press charges.

¶15. Additionally, Dunta testified about the fourteen years he spent in the MDOC prior to his new sentencing hearing. He admitted the rule violations he had committed for having cash, being in another resident's cell without permission, holding a cell-door open when his laundry bag containing items he had just purchased from the commissary got caught in the sliding door, having a cell phone hidden in a mattress, and testing positive for marijuana.

8

Dunta also discussed his efforts to rehabilitate himself, including getting his GED and taking classes like "Anger Management" and "Computer Science."

¶16. Dunta's final witness was Susan Guness, who, as noted, was the co-founder of Angels By Your Side. A video was shown about the organization, and in that video ten volunteers offered employment, housing, friendship, and encouragement to Dunta.

¶17. The State's witness, Lieutenant Don Hicks, then testified. He described the investigation and his interview of Dunta. He said that during the interview, Dunta "didn't seem upset . . . I mean, . . . he turned himself in, but he knew we were looking for him and [it] took him three days to do that." Lieutenant Hicks said that when he interviewed Dunta, Dunta lied and told him Ealy had killed Jeanes, and then Dunta changed his story and admitted responsibility for the killing when he was interviewed by another officer.

¶18. Lastly, the victim's brothers, Kenneth and Mike Jeanes, gave their victim impact statements.

¶19. At the conclusion of the hearing, the Court took the matter under advisement. On May 28, 2019, the parties reconvened for the imposition of Dunta's sentencing. The circuit judge described the law applicable to his analysis and explained that he had reviewed the testimony and exhibits that had been submitted at the *Miller* hearing. He further explained that under the applicable caselaw, "the burden is on the Defendant to convince the Court that the *Miller* factors or considerations require parole eligibility, and so I examined the testimony and the evidence for that." The circuit judge then made oral findings on each *Miller* factor.

To avoid repetition, the circuit court's findings with respect to each of these factors is discussed in detail below. On May 31, 2019, the circuit court entered its resentencing order:

> Having heard and fully considered the matters presented by both the State and the Defendant, the Court finds as follows:
>
>> For those reasons announced by the Court on the record, the Court finds that the Defendant, DUNTA DOTSON, has failed to convince the Court that *Miller* considerations prohibit the imposition of a sentence of life without parole in this case. Therefore, for his conviction of MURDER AS A LESSER INCLUDED OFFENSE OF CAPITAL MURDER, the Court hereby sentences the Defendant, DUNTA DOTSON, to serve a term of life imprisonment in the custody of the [MDOC]. The Court specifically finds that, under the facts of this case, the application of Miss. Code Ann. § 47-7-3(1)(h) is not constitutionally prohibited, and, therefore, the sentence imposed is without the possibility of parole.

¶20.    Dunta filed his notice of appeal on July 3, 2019.

¶21.    On March 9, 2020, during the course of this appeal, the United States Supreme Court granted certiorari in *Jones v. Mississippi*, No. 18-1259, to decide whether the Eighth Amendment to the United States Constitution requires a finding that a juvenile offender is "permanently incorrigible" before a life-without-parole sentence can be imposed. The case was argued before the United States Supreme Court on November 3, 2020. No decision has yet been issued.

¶22.    Dunta filed a motion to stay this case until the United States Supreme Court issues its decision in *Jones*. On September 3, 2020, this Court found that Dunta's motion should be held in abeyance so the Court could conduct the oral argument that Dunta's counsel

requested. Pursuant to that Order, Dunta's motion to stay this appeal was deferred and held in abeyance until further notice. Having now held oral argument on December 9, 2020, we deny Dunta's motion to stay without prejudice. Dunta may continue to raise this issue in a motion for rehearing.

## STANDARD OF REVIEW

¶23. The Mississippi Supreme Court held in *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018), that "there are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id*.

## DISCUSSION

¶24. On appeal, Dunta asserts that (1) the circuit court applied the incorrect legal standard in sentencing him to life without parole; (2) his life-without-parole sentence must be vacated because it is disproportionate as a matter of law; (3) due process requires a specific finding of permanent incorrigibility; and (4) a life-without-parole sentence violates the Eighth Amendment of the United States Constitution and Article 3, Section 28 of the Mississippi Constitution in all cases in which the defendant was under the age of eighteen at the time of the offense.

¶25. In a series of recent decisions, this Court and the Mississippi Supreme Court have

rejected arguments (3)[2] and (4).[3] Those arguments, therefore, require no new discussion in this case. We now turn to address Dunta's two remaining contentions: (1) that the circuit court applied the incorrect legal standard in sentencing him to life without parole; and (2) that in this case Dunta's life-without-parole sentence is disproportionate as a matter of law.

## I. Applicable Legal Standard

¶26. Dunta asserts that the circuit court applied the wrong legal standard in sentencing him to life without parole. Dunta claims this is so because the Mississippi Supreme Court acknowledged in *Wharton*, 298 So. 3d at 926 (¶23), the creation of "a new substantive rule of constitutional law" that bars life without parole "for all but 'the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at (¶22) (quoting *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016)). As we have recognized above, "whether the circuit court applied the correct legal standard is a question of law subject to de novo review." *Chandler*, 242 So. 3d at 68 (¶7). For the reasons discussed below, we find Dunta's assertions on this issue without merit.

---

[2] *Wharton v. State*, 298 So. 3d 921, 927 (¶25) (Miss. 2019); *Chandler v. State*, 242 So. 3d 65, 69 (¶15) (Miss. 2018), *cert. denied*, 139 S. Ct. 790 (2019); *Young v. State*, 294 So. 3d 1238, 1241 (¶10) (Miss. Ct. App. 2020); *Ealy v. State*, No. 2017-KA-01536-COA, 2019 WL 5704145, at *6 (¶¶30-31) (Miss. Ct. App. Nov. 5, 2019) (mot. for reh'g pending); *Jones v. State*, 285 So. 3d 626, 632 (¶17) (Miss. Ct. App. 2017), *cert. granted*, 250 So. 3d 1269 (Miss. 2018), *cert. dismissed*, No. 2015-CT-00899-SCT, 2018 WL 10700848 (Miss. Nov. 29, 2018), *cert. granted*, 140 S. Ct. 1293 (2020); *Cook v. State*, 242 So. 3d 865, 876 (¶39) (Miss. Ct. App. 2017), *cert. denied*, 237 So. 2d 1269 (Miss. 2018), *cert. denied*, 139 S. Ct. 787 (2019).

[3] *McGilberry v. State*, 292 So. 3d 199, 205 (¶¶25-27) (Miss. 2020); *Wharton*, 298 So. 3d at 926 (¶22); *Jones*, 285 So. 3d at 631 (¶¶14-15); *Cook*, 242 So. 3d at 877-78 (¶45).

12

¶27. In contending that *Wharton* created a new legal standard, Dunta ignores two salient points that the Mississippi Supreme Court specifically recognized in that case: (1) "*Miller* does not 'require trial courts to make a finding of fact regarding a child's incorrigibility,'" *Wharton*, 298 So. 3d at 926 (¶25) (quoting *Chandler*, 242 So. 3d at 69 (¶15); and (2) "[t]he [United States] Supreme Court has left to the states the responsibility to determine how *Miller* is to be implemented in state-court proceedings and how to remedy a *Miller* violation or potential violation." *Id.* at 926 (¶24) (quoting *Montgomery*, 136 S. Ct. at 735-36). Contrary to Dunta's assertions, we find that no "new legal standard" was announced in *Wharton*.

¶28. In *Chandler*, 242 So. 3d at 68 (¶8), the Mississippi Supreme Court found that the *Miller* sentencing authority in that case "appl[ied] the correct legal standard because it afforded [the defendant] a hearing and sentenced [the defendant] after considering and taking into account each factor identified in *Miller* and adopted in *Parker*." As the supreme court recognized in *Parker*, "*Miller* does not prohibit sentences of life without parole for juvenile offenders. Rather, it 'requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013) (quoting *Miller*, 567 U.S. at 480). The five factors "identified in *Miller* and adopted in *Parker*[,]" *Chandler*, 242 So. 3d at 68 (¶8), include: (1) "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "family and

13

home environment that surrounds [the defendant]"; (3) "circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth"; and (5) "the possibility of rehabilitation." *Miller*, 567 U.S. at 477-78; *see Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26).

¶29. "[T]he burden rests with the juvenile offender to convince the sentencing authority that *Miller* considerations are sufficient to prohibit a sentence of life without parole." *Wharton*, 298 So. 3d at 927 (¶25) (internal quotation marks omitted). In this regard, "[i]f the offender persuades the judge that the *Miller* factors preponderate in favor of parole eligibility, then the judge must declare the offender parole eligible." *Cook*, 242 So. 3d at 873 (¶27). "If, however, the judge determines that *Miller* does not mandate parole eligibility, then the judge must deny relief because the Legislature has provided by law that persons convicted of murder are not eligible for parole." *Id.* at 873-74 (¶27).

¶30. In this case, Dunta was provided a full and fair evidentiary hearing. He was represented by counsel, and he presented his own testimony, the testimony of Susan Guness, the co-founder of Angels By Your Side, and the expert testimony and report of Dr. Lott, a forensic and clinical psychologist. Recognizing that Dunta bore the burden of proving that the *Miller* factors "preponderate in favor of parole eligibility," *id.* at 873 (¶27), the circuit court judge, in accordance with *Miller* and *Parker*, considered and took into account each of

14

the *Miller* factors based on the testimony and evidence presented at the hearing. The circuit court applied the correct legal standard.

## II. The Circuit Court's Application of the Legal Standards in Dunta's Case

¶31. Dunta asserts that his life-without-parole sentence is "disproportionate as a matter of law" because Dr. Lott's "unrebutted testimony . . . clearly showed Dunta is not irreparably corrupt." In support of this assertion, Dunta quotes Dr. Lott's opinion, as follows:

> In sum, it is my opinion, to a reasonable degree of psychological certainty, that Mr. Dotson does not appear to represent one of those "rare" and "uncommon" offenders who are incapable of being rehabilitated and thus are irredeemably incorrigible, and he has already exhibited the potential for successful rehabilitation while in prison. He also has significant family and community support and he would likely continue to be function in a prosocial manner in the community if he is given the opportunity.

¶32. Dunta asserts that reversal is required in this case because the State did not present an expert to "rebut" Dr. Lott's opinion. This Court rejected the same argument in *Martin*, in which we explained "that the State had no special burden to present its own expert to rebut the same opinion offered by Dr. Lott." *Martin v. State*, No. 2018-KA-00381-COA, 2020 WL 772730, at *7 (¶25) (Miss. Ct. App. Feb. 18, 2020) (mot. for reh'g pending).

¶33. Further, in *Shoemake*, we held that the *Miller* "analysis does not turn solely upon [the 'possibility of rehabilitation'] factor. In both *Miller* and *Parker*, the U[nited] S[tates] Supreme Court and the Mississippi Supreme Court . . . both consider rehabilitation as one of several factors to apply in determining whether [life without parole] should be imposed on a juvenile offender." *Shoemake v. State*, No. 2017-CA-01364-COA, 2019 WL 5884479,

15

at *9 (¶43) (Miss. Ct. App. Nov. 12, 2019) (citing *Miller*, 567 U.S. at 477-78; *Parker*, 119 So. 3d at 995-96, 998 (¶¶19, 26)) (mot. for reh'g pending); *see also Martin*, No. 2018-KA-00381-COA, 2020 WL 772730, at *7 (¶25). As we explained in *Shoemake*, "[i]n neither [*Miller* nor *Parker*] is the potential for rehabilitation dispositive, or even given more weight in the sentencing analysis." *Id.*

¶34. We have determined above that the circuit court in this case "applied the proper legal standard" in its *Miller* analysis. We therefore review "its sentencing decision . . . for an abuse of discretion." *Chandler*, 242 So. 3d at 68 (¶7). As detailed below, we find that the circuit court appropriately considered all of the *Miller* factors and its findings are supported by substantial evidence. We turn now to a discussion of the five *Miller* factors.

### 1. Age and Its Hallmark Features

¶35. In addressing this factor, the circuit court recognized that Dunta was fifteen-years and three-months old at the time of the crime. Although Dr. Lott generally addressed the "hallmark features" of Dunta's chronological age, including immaturity, impetuosity, and a failure to appreciate risks and consequences, the circuit court found that many of these elements did not have "any specific applicability" to Dunta. For example, the circuit court judge stated that he did not see any evidence that led him to believe that peer pressure was a significant factor in this case. In Dr. Lott's opinion, when Dunta and his family moved to Jackson, he began to "affiliate with other at-risk teens" and was affected by "peer influence," but, according to Dr. Lott, "it's not peer pressure. It's just peer influence I think in his case."

16

¶36. Nor did the circuit court find that impulsivity or self-control were factors in this case, despite Dr. Lott's testimony that he found these traits were beginning to manifest in Dunta around the time he moved to Jackson (a few months before the murder occurred). In the circuit court's judgment, after hearing the testimony and reviewing the evidence, it appeared that on the day of the murder, "there was plenty of time for [Dunta] . . . to think about what was going on. He had time to think and plan. There were a number of opportunities for this whole process to have stopped and yet it did not." The circuit court found that "rather than being impulsive, this looks more as a planned premeditated event under the facts of this case."

¶37. The circuit court ultimately concluded that other than Dunta's age, "not much else" supported parole eligibility under this factor.

### 2. Family and Home Environment

¶38. Dr. Lott testified that Dunta's family and home environment were mostly positive. The circuit court acknowledged that there was some testimony that Dunta "had a somewhat less than a perfect or ideal upbringing," but in "looking at Dr. Lott's reports and other [reports]," the circuit court found that this was not a significant factor in this case, weighing only slightly, if at all, in Dunta's favor.

### 3. Circumstances of the Murder

¶39. Regarding the circumstances of the homicide, the circuit court found that the "circumstances of this crime weigh heavily against parole." Based upon its review of the

17

evidence and hearing the testimony of the witnesses, the circuit court found that Dunta, along with Ealy, "had an opportunity to plan and consider it. . . . [There] was a considerable period of time from the time [Dunta and Ealy] first saw the house and decided what they were going to do . . . [, and then] they went and got help." The circuit court found that "[t]here's no way that this was anything but premeditated, and [Dunta] was a principal actor in that he was, in fact, the person that shot the deceased."

¶40.   In finding that there did not appear to be any coercion or peer pressure involved, the circuit judge observed that Dunta and Ealy "were relatively close in age while they had been running together doing some crimes for months, according to what the defendant himself said.  I don't see that one had the influence over the other."  "Instead," the circuit judge found, "this was something that was jointly planned and executed so this factor weighs heavily against parole."

### 4.   Incompetencies of Youth

¶41.   On the next *Miller* factor—"whether Dunta might have been charged or convicted of a lesser offense if not for the incompetencies associated with youth"—the circuit court found that there was no evidence that Dunta lacked the capacity to "deal with police officers or prosecutors or . . . assist his own attorneys [in this case]."  "Instead," the circuit judge found "it's to the contrary.  [Dunta] pled to a lesser offense.  He was charged with capital murder and he pled to murder.  I see nothing here to weigh in favor of the defendant [on this factor]."

### 5.   Possibility of Rehabilitation

18

¶42. Lastly, with respect to the possibility of rehabilitation, the circuit court found that although " we always like to think that there is a possibility of rehabilitation, under Dr. Lott's testimony that's difficult to predict." In this case, the circuit court found that "there [are] certain instances . . . since the commission of this crime that would be both favorable and unfavorable for the defendant[.]" The record reflects that Dunta received six "RVRs" for nonviolent offenses in the fourteen years he had been incarcerated prior to his *Miller* hearing. Dunta made a number of efforts to rehabilitate himself while he was incarcerated, including getting his GED, working as a barber, and completing several rehabilitative programs, as described above. The circuit court found that there was "just not enough [evidence], though, to support a weighing in favor of parole in this case."

¶43. The circuit court concluded that Dunta failed to show that the *Miller* factors required that he receive a sentence of life with eligibility for parole. Thus, the circuit court found the statutory sentencing guidelines of section 47-7-3 were "not constitutionally prohibited" and resentenced Dunta to life without eligibility for parole.

¶44. We find that the circuit court properly considered all of the *Miller* factors and did not abuse its discretion in sentencing Dunta to life without parole. Accordingly, the circuit court's ruling that Dunta is not entitled to relief under *Miller* and Dunta's sentence of life imprisonment without eligibility for parole are affirmed. Additionally, as we have noted above, Dunta filed a motion to stay this case until the United States Supreme Court issues its decision in *Jones*. We deny Dunta's motion to stay without prejudice. Dunta may raise this

19

issue in a motion for rehearing.

¶45.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.   WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**