# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01364-COA

**CHARLES DALTON SHOEMAKE**                                            **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/08/2017 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | STACY L. FERRARO |
| | JOHN R. CASCIANO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  ALICIA MARIE AINSWORTH |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 11/12/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     In January 2012 Charles Dalton Shoemake and his friend Nicholas Walker murdered Paul Victor III.  Shoemake was seventeen years and 347 days old at the time.  In January 2014 Shoemake pleaded guilty to murder in violation of Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2006).  On March 18, 2014, the DeSoto County Circuit Court held a sentencing hearing pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *Parker v. State*, 119 So. 3d 987 (Miss. 2013).  On March 28, 2014, the trial court[1] issued its written order sentencing Shoemake to life imprisonment without eligibility for parole (LWOP).

---

[1] We refer to the court issuing Shoemake's sentence as the "trial court."

¶2. After Shoemake was sentenced, the United States Supreme Court decided *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). On March 16, 2017, Shoemake filed a motion for post-conviction relief (PCR) asserting that his sentence should be vacated, set aside, or corrected under the Supreme Court's guidance on *Miller*'s application in *Montgomery*. The post-conviction court[2] requested the State to file a response, which it did, and Shoemake filed a reply. The post-conviction court denied Shoemake's PCR motion.

¶3. Shoemake appeals, asserting that his LWOP sentence should be vacated because it is disproportionate as a matter of law; should be vacated and remanded for resentencing because the trial court did not make a finding that he is "permanently incorrigible," which Shoemake asserts is required under *Miller* as clarified by *Montgomery*; and should be vacated because sentencing a juvenile offender to LWOP violates the Eighth Amendment of the United States Constitution and Article 3, Section 28 of the Mississippi Constitution. Finding no error, we affirm the trial court's denial Shoemake's PCR motion.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶4. The record reflects that on January 21, 2012, under a ruse that Shoemake and Walker were going to repay a debt owed to Victor,[3] Shoemake and Walker contacted Victor to arrange to pick him up in Olive Branch, Mississippi in a subdivision where both Victor and

---

[2] To distinguish this court from the original sentencing court we refer to this court as the "post-conviction court."

[3] According to police reports in the record, Walker told police that earlier in the day he and Shoemake had purchased drugs from Victor and paid for the drugs with counterfeit money.

Shoemake lived.[4] Before contacting Victor, the record reflects that Shoemake and Walker planned to kill Victor. They prepared to kill him by gathering a gun and a short piece of an extension cord, as well as a can of gas to use in disposing of the body.

¶5. With Walker driving, Shoemake and Walker picked up Victor. Walker drove a short distance and then pulled the car over. The record reflects that Walker then struck Victor several times in the head with the butt of a gun while Shoemake, who was in the backseat of the car on the passenger side, strangled Victor from behind with the extension cord. Shoemake and Walker then drove to Shelby Farms in Shelby County, Tennessee. There, they dragged the body to a wooded area off of a walking trail and set Victor's body on fire. Shoemake and Walker left the burning body in the wooded area where it was eventually discovered.

¶6. Shoemake was originally indicted for conspiracy to commit murder and for capital murder. In March 2013, Shoemake's indictment was amended to charge him with conspiracy to commit murder; murder under Mississippi Code Annotated section 97-3-19(1)(a); and kidnapping. On January 14, 2014, pursuant to a plea agreement, Shoemake pleaded guilty to murder, with the conspiracy and kidnapping charges to be remanded.[5] At Shoemake's plea

---

[4] At Shoemake's January 2014 plea hearing, the State summarized its proof on the murder charge against Shoemake. This synopsis of the facts is based upon this Court's own review of the record as well as the factual summary provided by the State at Shoemake's plea hearing. At that hearing Shoemake stated that he had no disagreement with the State's summary of the proof it had against him, and he admitted his guilt to the murder charge against him.

[5] *Rush v. State*, 749 So. 2d 1024, 1027 (¶10) (Miss. 1999) ("If a plea bargain allows a defendant facing multiple charges to plead to one charge in exchange for having the other charges dismissed or remanded, the remanded charges are barred from further

3

hearing the trial court accepted Shoemake's guilty plea on the murder charge, finding that the State set forth a sufficient factual basis upon which to base the guilty plea and that Shoemake's guilty plea was freely and voluntarily given.

¶7. Shoemake's sentencing hearing was held on March 18, 2014. Because Shoemake was under the age of eighteen at the time he committed the crime, the trial court conducted his sentencing hearing in light of *Miller* and *Parker*.

¶8. Two witnesses testified for the State: Memphis Lieutenant Kevin Helms and Dr. Chris Lott. Victor's mother also gave victim-impact testimony. Lieutenant Helms testified briefly about the discovery of Victor's burned body and his initial interview with Shoemake.[6] He testified that Shoemake denied any involvement in the crime and that during the interview Shoemake was "nonchalant" and that it appeared that he "didn't care."

¶9. Dr. Lott was admitted as an expert in the field of forensic psychology. He testified about the competency exam he performed on Shoemake. Dr. Lott recounted Shoemake's background, including Shoemake's home and school life. He testified that Shoemake came from a "stable and secure [home] environment" and that Shoemake had described his relationship with his mother and father "very positively." Dr. Lott also testified that Shoemake was an honor student, he had taken several Advanced Placement classes, "[he]

---

prosecution.").

[6] DVDs containing the video-taped police interviews of Shoemake and Walker that were conducted on January 22 and 23, 2012, were admitted into evidence at Walker and Shoemake's April 2, 2013 competency hearing before Judge Chamberlain. Judge Chamberlain also conducted Shoemake's sentencing hearing. The DVDs are part of the appellate record.

was poised to attend college and doing quite well," and he had a part-time job working at a western supply store for about a year prior to his arrest. Dr. Lott described Shoemake as being quiet, respectful, and mild-mannered and that "he presented as a typical high school senior." Dr. Lott testified that he administered a number of tests to Shoemake, including an abbreviated IQ test, an achievement test, and a personality test. According to Dr. Lott, Shoemake put forth good effort, and his scores were average. His IQ score was lower than expected, but higher than an eleventh-grade level. Dr. Lott also testified that Shoemake had a history of anxiety. Dr. Lott testified that Shoemake was seventeen years and 347 days old at the time of the crime and that there would be no significant difference in maturity in someone eighteen days older or even a few months older.

¶10. The defense presented testimony from Dr. Fred Steinberg and re-called Dr. Lott. Other witnesses who testified for the defense included Shoemake's high school principal, George Loper, a number of Shoemake's friends or family friends, and Shoemake's mother, Nancy Foster. Shoemake was also given the opportunity to address the court at the end of the sentencing hearing.

¶11. Dr. Steinberg was admitted as an expert in the field of clinical and forensic psychology of children. He testified generally about the maturity level of minors, their "lesser ability" to appreciate risks and consequences of their actions, lack of the maturity to control impulses, and susceptibility to succumb to peer pressure. Dr. Steinberg's testimony about Shoemake's upbringing and his family stability was similar to Dr. Lott's testimony on these issues, and Dr. Steinberg also reiterated that Shoemake had a history of anxiety

5

disorder. He testified that it was an understandable act by a juvenile not to cooperate with the police. Dr. Steinberg opined, "[I]t's probable that [Shoemake] can be rehabilitated . . . . I think there is rehabilitation potential down the road."

¶12. The defense re-called Dr. Lott. He identified several records from a Dr. Ali who treated Shoemake and, according to the records, had apparently prescribed pluoxetine for Shoemake. Dr. Lott testified that pluoxetine was an antidepressant that was also used to treat general anxiety disorder. When questioned about whether Shoemake should possibly be allowed back into society, Dr. Lott testified, "In my opinion, [Shoemake] is not a Ted Bundy. . . . He does not have that personality profile that would suggest to me that he would not be amenable to treatment."

¶13. The defense's next witness was George Loper, Shoemake's principal. He testified that Shoemake had graduated by taking his final exams while in jail, that Shoemake made a 25 on the ACT test, and that Shoemake was "college ready." Loper identified Shoemake's acceptance letters from Northwest Community College, Mississippi State University, and Louisiana State University. Loper also testified that he did not think that the circumstances surrounding Shoemake's involvement in Victor's death were normal for Shoemake, and he further testified that allowing Shoemake back into society some day "could be okay."

¶14. The defense's next three witnesses were Alex England, Shoemake's long-time friend; Darrin McDowell, Shoemake's mother's best friend who had known Shoemake all his life; and Linda Sutton, a family friend who had known Shoemake and his family since Shoemake was three or four years old. These witnesses provided similar testimonies that Shoemake was

6

a normal, sweet, kind person with good support from his family and friends and that Shoemake belongs back in society some day. The defense's final witness was Nancy Foster, Shoemake's mother, who testified on his behalf. Finally, Shoemake gave an allocution in which he briefly apologized for his actions.

¶15. The trial court issued its written order sentencing Shoemake to LWOP on March 28, 2014.[7] In that order, the trial court set out its obligations under *Miller* and *Parker* and then it assessed each of the five *Miller* factors, as well as additional considerations described in *Miller* that the court found pertinent to its analysis. These considerations included comparing a fourteen-year-old to a seventeen-year-old, a "shooter" to an "accomplice," and a child from a "stable" home to a child from an "abusive" or "chaotic" home. *Miller*, 567 U.S. at 477. After assessing these factors and considerations in light of the record before it and the testimony and evidence presented at the sentencing hearing, the trial court found that "[i]t is hard to imagine many realistic situations where the factors would weigh more heavily against a defendant than they do in the case at hand." The trial court sentenced Shoemake to LWOP.

¶16. The United States Supreme Court decided *Montgomery* in January 2016. On March 16, 2017, Shoemake filed a PCR motion, asserting that his LWOP sentence should be vacated, set aside, or corrected because in light of the Supreme Court's "clarification" regarding the application of *Miller* in *Montgomery*, the trial court applied the wrong legal standard by not making a finding that he was "irreparably corrupt." Alternatively, Shoemake

---

[7] To avoid repetition, the Court will address the details relating to the trial court's sentencing order when it discusses the *Miller* factors below.

7

asserted that the post-conviction court should adopt a categorical ban on LWOP sentences as unconstitutional under the Eighth Amendment of United States Constitution and Article 3, Section 28 of the Mississippi Constitution. Shoemake further asserted that the post-conviction court should vacate his sentence on this basis.

¶17. Shoemake attached to his PCR motion his MDOC records that reflected that Shoemake had never received a rule-violation report while incarcerated. Also attached to Shoemake's PCR motion was an affidavit from Dr. Lott, the State's expert who testified at Shoemake's sentencing hearing. The record reflects that Dr. Lott provided his affidavit at the request of defense counsel to explain his testimony at the sentencing hearing where he said: "In my opinion, [Shoemake] is not Ted Bundy." He stated in his affidavit that "Ted Bundy was a malicious sociopath or psychopath" and that Shoemake had not exhibited any of the traits associated with these personality disorders. Lott's affidavit also provides:

> All the information I obtained from collateral sources, including [Shoemake's] teachers, friends, and employer indicated that [Shoemake] was a very polite and respectful adolescent. This crime was the only violent act in [Shoemake's] life history. [Shoemake's] previous pattern of behavior indicated that he was a normal teenager who made good grades, had a part-time job, and was accepted into three colleges. Although I cannot opine with certainty regarding [Shoemake's] behavior post release, it is my opinion that [Shoemake] has the intellectual capacity and family support for a successful reintegration into society if given the opportunity and appropriate support, and he does not appear to be one of those "rare" and "uncommon" juvenile offenders who are incapable of being rehabilitated and thus are irredeemably incorrigible.

¶18. The post-conviction court requested the State to file a response to Shoemake's PCR motion, which it did, and Shoemake filed a reply. Based upon its review of the pleadings in the case before it and the contents of the criminal case, Cause No. CR2012-577GCD, the

8

post-conviction court denied Shoemake's PCR motion without an evidentiary hearing. The post-conviction court found that the issues before it were "purely legal," thus an evidentiary hearing was not necessary. Regarding the first issue Shoemake raised, the post-conviction court found that the trial court had applied the correct legal standard in sentencing Shoemake to LWOP. The post-conviction court also addressed Shoemake's alternative request for it to impose a categorical ban on LWOP sentences. The post-conviction court declined to do so, observing that neither the United States Supreme Court, the Mississippi appellate courts, nor the Mississippi Legislature, had made such a categorical finding. Shoemake appeals.

**STANDARD OF REVIEW**

¶19. "When reviewing a circuit court's denial or dismissal of a PCR motion, we will reverse the judgment of the circuit court only if its factual findings are clearly erroneous; however, we review the circuit court's legal conclusions under a de novo standard of review." *Berry v. State*, 230 So. 3d 360, 362 (¶3) (Miss. Ct. App. 2017) (internal quotation marks omitted).[8] Specifically with respect to the issues in this case, the Mississippi Supreme Court held in *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018), that "there are two applicable standards of review in a *Miller* case. First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for abuse of discretion." *Id.*

---

[8] Shoemake's PCR motion was timely filed, having been filed within three years from entry of the trial court's written order sentencing Shoemake to LWOP on March 28, 2014. Miss. Code Ann. § 99-39-5(2) (Rev. 2015); *see also Temple v. State*, 671 So. 2d 58, 59 (Miss. 1996).

## DISCUSSION

### I. The Validity of Shoemake's LWOP Sentence

¶20. Shoemake asserts that the Supreme Court "clarified" *Miller* in *Montgomery* when it observed that "[b]ecause *Miller* determined that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption, . . .'" *Montgomery*, 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479-80) (internal quotation mark omitted), *Miller* "rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 136 S. Ct. at 734. Relying on this language from *Miller*, as quoted by the Supreme Court in *Montgomery*, Shoemake asserts that "[b]ased on all of the evidence in the record, there is no question that [he] is not the rare juvenile offender whose crime reflects irreparable corruption. Therefore, [his] sentence is disproportionate as a matter of law and must be vacated."

¶21. In short, Shoemake contends that both the trial court and the post-conviction court applied the wrong legal standard in sentencing Shoemake to LWOP and that the post-conviction court applied the wrong legal standard in denying his PCR motion.

¶22. Shoemake also asserts that the trial court incorrectly applied *Miller*, as follows:

> Despite the existence—and extent—of [the] evidence on the record demonstrating that [he] was a typical high school senior who acted out-of-character one tragic evening when he committed an awful and impulsive crime for which he later admitted his guilt and sincere remorse, and quickly began to make every effort to rehabilitate himself, the [trial] court incorrectly applied *Miller* and sentenced [him] to life in prison without the possibility of parole.

¶23. In accordance with applicable precedent, we utilize a de novo standard of review in examining Shoemake's contention that the trial court applied the wrong legal standard in sentencing him to LWOP and his contention that the post-conviction court applied the wrong legal standard in denying his PCR petition. *See Chandler*, 242 So. 3d at 68 (¶7). We review Shoemake's contention that the trial court incorrectly applied *Miller* for abuse of discretion. *Id.*

¶24. As addressed below, we find that the trial court did not apply the wrong legal standard in sentencing him to LWOP, and we find that the post-conviction court did not apply the wrong legal standard in denying his PCR motion. In sum, the correct legal standard was applied and in accordance with Mississippi law. We further find that the trial court did not "misapply" *Miller*. On the contrary, the trial court satisfied its obligations under *Miller* and *Parker* by considering the five factors identified by *Miller*, as well as other considerations noted in *Miller*, including comparisons between "the [seventeen]-year-old and the [fourteen]-year-old, the shooter and the accomplice, [and] the child from a stable household and the child from a chaotic and abusive one." *Miller*, 567 U.S. at 477. Taking all these considerations into account, the trial court chose to sentence Shoemake to LWOP. We find no abuse of discretion in this decision, nor do we find any error in the post-conviction court's refusal to vacate Shoemake's sentence based on Shoemake's assertion that the trial court misapplied the *Miller* factors in reaching its sentencing decision.

### A. Applicable Legal Standard

¶25. Post-*Montgomery*, the Mississippi Supreme Court addressed the applicable legal

11

standard for a *Miller* sentencing hearing in *Chandler*, 242 So. 3d at 68 (¶10). Quoting *Montgomery*'s summary of *Miller*, the *Chandler* court recognized that under this U.S. Supreme Court precedent, "'a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing.'" *Chandler*, 242 So. 3d at 68 (¶10) (quoting *Montgomery*, 136 S. Ct. at 725 (citing *Miller*)). Following this observation, the Mississippi Supreme Court held that the sentencing authority in *Chandler* "appl[ied] the correct legal standard because it afforded [the defendant] a hearing and sentenced [the defendant] after considering and taking into account each factor identified in *Miller* and adopted in *Parker*. *Id.* at 68 (¶8). The supreme court also expressly held that "[t]he *Montgomery* Court confirmed that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." *Id.* at 69 (¶15).

¶26. The trial court in this case applied the correct legal standard. Shoemake's sentencing hearing was held on March 18, 2014. Both the State and the defense presented witnesses and evidence relating to the *Miller* factors. The court's sentencing order issued shortly thereafter reflects that in accordance with *Miller* and *Parker*, the trial court considered and took into account each of the *Miller* factors and other *Miller* considerations based on the testimony and evidence presented at the hearing.

¶27. Indeed, the trial court expressly observed in its sentencing order that under *Miller* it must determine whether the action of the juvenile, applying the applicable factors, constitutes "transient immaturity" or "irreparable corruption." *Miller*, 766 U.S. at 479-80. This is

12

essentially the same test that Shoemake asserts was "clarified" in *Montgomery* when the U.S. Supreme Court observed that "*Miller* determined that sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption,' *Miller*, 567 U.S. [at 479-80,] . . . [as compared to the juvenile offender] whose crimes reflect the transient immaturity of youth." *Montgomery*, 136 S. Ct. at 734.

¶28. The trial court acknowledged that the Supreme Court in *Miller* found that sentencing a juvenile to LWOP will be "uncommon," *Miller*, 567 U.S. at 479, but the trial court also observed that in "both *Miller* and *Parker* [the courts] acknowledge that there are circumstances where such a sentence is appropriate." *Miller*, 567 U.S. at 480; *Parker*, 119 So. 3d at (¶28). The trial court found that Shoemake's case was such a case and sentenced Shoemake to LWOP.

¶29. As we address below, the trial court explained the basis for its decision in detail. Although the trial court did not expressly state in its conclusion that Shoemake's "crime reflect[ed] irreparable corruption," under Mississippi Supreme Court precedent, the trial court was not required to frame its conclusion in those precise terms. *Chandler*, 242 So. 3d at 69 (¶15). Moreover, it is plain from the trial court's discussion of *Miller* in its sentencing order that the trial court understood that this was the task before it, and it used the *Miller* factors and other considerations from *Miller* in making this assessment. In short, we find that the trial court applied the correct legal standard.

¶30. We likewise find no error in the post-conviction court's denial of Shoemake's PCR motion based on its determination that the trial court used the correct legal standard and

13

"followed the requirements of *Parker* and *Miller*" when it sentenced Shoemake. The post-conviction court found that the U.S. Supreme Court in *Montgomery* did not "expand" its holding in *Miller* but rather addressed the issue before it: whether *Miller* should be applied retroactively. *Montgomery*, 136 S. Ct. at 725. As to this issue, which the *Montgomery* Court decided in the affirmative, the post-conviction court observed that the Mississippi Supreme Court had already reached the same conclusion. *See Jones v. State*, 122 So. 3d 698, 703 (¶18) (Miss. 2013) ("We are of the opinion that *Miller* created a new, substantive rule which should be applied retroactively to cases on collateral review."). In any event, *Miller*'s retroactive application is not at issue in this case. Shoemake pleaded guilty to murder and was sentenced in 2014—two years after *Miller* was decided.

### B. Application of the *Miller* Factors

¶31. As noted above, we review the trial court's application of *Miller*, as accepted by the post-conviction court, for abuse of discretion. In *Miller*, the U.S. Supreme Court did not establish a specific procedure for the lower courts to follow when sentencing juvenile homicide offenders, but the U.S. Supreme Court did identify a number of factors it found to be relevant in the sentencing decision, as follows:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or

14

prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 567 U.S. at 477-78 (citations omitted). In *Parker*, the Mississippi Supreme Court held that the five factors identified by the *Miller* Court must be considered by the sentencing authority in determining whether a juvenile homicide offender may be sentenced to LWOP. *Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26); *see Chandler*, 242 So. 3d at 68-69 (¶¶11-12).

¶32. The record and the trial court's order in this case show that it took into account and considered each of the *Miller* factors, thus complying with *Miller* and *Parker*. We address each of these factors in turn, below, as well as the additional *Miller* considerations that the trial court took into account. We find that based upon our review of the record and the applicable precedent, the trial court did not abuse its discretion in concluding that Shoemake should be sentenced to LWOP in this case.

### 1. Shoemake's Chronological Age and Its Hallmark Features

¶33. The trial court found that Shoemake was seventeen years and 347 days old when he committed the crime—just eighteen days short of his eighteenth birthday when the *Miller* factors would not apply. The trial court recognized that, nevertheless, it was still required to apply the *Miller* factors, but the trial court did acknowledge that Shoemake's actual age was a consideration. For comparison purposes, the trial court noted that in *Miller* and its companion case, *Jackson v. Hobbs*, No. 10-9647, both defendants were fourteen years old at the time of the crime in question. *Miller*, 567 U.S. at 465, 467. The trial court recognized that both Dr. Steinberg and Dr. Lott had testified, generally, about juveniles and their

15

immaturity, impetuosity, and their inability to fully appreciate risks and consequences. The trial court further recognized, however, that only a small amount of Dr. Steinberg's testimony was specific to Shoemake, and, other than referencing Shoemake's anxiety disorder, Dr. Steinberg did not really address how these general findings about juveniles specifically related to Shoemake.

¶34. The trial court found instead that Dr. Steinberg testified that Shoemake was quiet, respectful, and mild-mannered, as well as an honor student who attended Advanced Placement classes and held down steady, part-time employment. The trial court further found that there was no evidence presented that Shoemake had even the slightest problem with impulse control before the event in question, and Shoemake had no history of aggression. In concluding its discussion of this factor, the trial court found that unlike the defendants in *Miller* and *Jackson*, Shoemake was not a troubled fourteen year old. He was a well-adjusted, seemingly typical teenager who was just short of his eighteenth birthday.

### 2. Shoemake's Family and Home Environment

¶35. With respect to Shoemake's home and family environment, the trial court found that "by all accounts, Shoemake comes from a stable and caring family." In particular, the trial court found that Shoemake had a good relationship with his parents and that he had no history of drug use or mental illness other than general anxiety. Comparing Shoemake's family life to the defendants in *Miller* and *Jackson*, the trial court here observed that Miller had been in and out of foster care, his mother had been a drug addict and alcoholic, and his step-father abused him. *Miller*, 567 U.S. at 467. Further, Miller had attempted suicide on

16

at least four occasions, and Jackson's mother and grandmother had both shot individuals in the past. *Id.* at 467, 478. The trial court here found that Shoemake comes from a loving and caring home while the defendants in *Miller* and *Jackson* did not have the benefit of such stability.

### 3. The Circumstances of the Offense (Participation and Peer Pressure)

¶36. Addressing the circumstances surrounding Victor's murder, the trial court found that Shoemake's actions were "clearly heinous"—recognizing that this case concerns "a planned and executed murder" and not a situation involving heat-of-passion, diminished capacity, or an accident. The trial court further found no evidence that Shoemake succumbed to any peer pressure from Walker or pressure of any type in participating in the murder. Rather, Shoemake participated equally in the murder, as well as in the disposing of the body and covering up of the crime. Comparing these circumstances to *Miller*, the trial court observed that the crime in *Miller* occurred after a night of drinking and drug use in which the victim had participated. *Miller*, 567 U.S. at 468. The trial court also found that Shoemake's crime was premeditated murder and not the "botched robbery turn[ed] into a killing" that occurred in both Miller's and Jackson's cases. *Id.* at 473.

### 4. Shoemake's Ability to Deal with the Legal System and Assist His Counsel.

¶37. Regarding Shoemake's ability to navigate the legal system, the trial court found that there was no evidence presented that reflected that Shoemake, prior to obtaining counsel, was unable to "deal with the legal system"; nor was any evidence presented that Shoemake, once

he obtained counsel, lacked the ability to assist his lawyer. The trial court reiterated that Shoemake was an honor student taking Advanced Placement classes with a solid ACT score and acceptance letters from at least three colleges. The trial court further found that Shoemake was competent to testify after a competency hearing.

### 5. The Possibility of Rehabilitation

¶38. Shoemake asserts that "most detrimental to the trial court's order . . . is the court's complete failure to assess arguably the most important of the *Miller* factors—[his] capacity for rehabilitation." We find no merit in this assertion. The trial court addressed the rehabilitation factor as follows:

> Clearly this court does not have the clairvoyance to know if Shoemake can, in fact, be rehabilitated. On the issue, Dr. Steinberg says that generally only a small percentage of adolescents continue risky behavior. He believes it is "probable" that Shoemake can be rehabilitated. Dr. Lott did not specifically state an opinion as to Shoemake's rehabilitation. However, as to possibility of recidivism, he did indicate that Shoemake is "not a Ted Bundy." George Loper felt that Shoemake "could be okay" in society someday, and several friends stated [that] they felt Shoemake could be rehabilitated. . . . Suffice to say, there are a number of factors (the fact that the crime has been committed being only one of them) to be considered in addressing the issue of rehabilitation.

¶39. The trial court also addressed the rehabilitation factor in the conclusion of its sentencing order, as follows:

> Defense counsel basically argues that Shoemake is a young man who made a "mistake" (although acknowledging it to be, in essence, a terrible and tragic mistake) who can be "rehabilitated." However, even the expert witnesses' testimony was equivocal at best as to the possibility of rehabilitation. Dr. Steinberg felt rehabilitation was "probable" although acknowledging that one's past behavior is an indicator of future behavior. . . . Further, the main supporting evidence set forth for a claim of rehabilitation in the future (Shoemake's intelligence, his stable and supportive family, etc.) are the very elements of proof that weigh so heavily against him under the other *Miller*

18

factors.

¶40. We find that the record reflects that the trial court considered the rehabilitation factor along with the other four factors it was obligated to consider under *Miller* and *Parker*. *Chandler*, 242 So. 3d at 68 (¶8). There is no Mississippi precedent for the proposition that the possibility of rehabilitation overrides the other *Miller* factors—or even that it is the preeminent factor. Rather, it is one of the five *Miller* factors a trial court must consider in determining whether to sentence a juvenile offender to LWOP. *Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26).

### 6. Additional Factors under *Miller*

¶41. The trial court also observed that the U.S. Supreme Court in *Miller* listed several comparisons that are relevant in Shoemake's case, including comparisons between "the [seventeen]-year-old and the [fourteen]-year-old, the shooter and the accomplice, [and] the child from a stable household and the child from a chaotic and abusive one." *Miller*, 567 U.S. at 477. The trial court found that the results from each comparison were directly on point in analyzing Shoemake's case: Shoemake was nearly eighteen years old when the crime was committed; he was one of two principals in Victor's murder (not a spectator); and, "based on the evidence presented, Shoemake could not have come from a more stable home." In short, the trial court found that "[i]t is hard to imagine many realistic situations where the factors would weigh more heavily against a defendant that they do in the case at hand." Following this analysis, the trial court sentenced Shoemake to LWOP.

¶42. We find no abuse of discretion in the trial court's assessment. Indeed, the trial court

19

had the opportunity to observe Shoemake's demeanor and behavior during the sentencing hearing, as well as during Shoemake's competency hearing and plea hearing that also took place before that court. The trial court did not automatically sentence Shoemake to life in prison without parole, but instead assessed each of the five *Miller* factors and other considerations observed by the *Miller* Court before it imposed this sentence. As addressed above, the evidence and testimony presented at the sentencing hearing showed that Shoemake was an intelligent, well-adjusted seventeen-year-old high school senior with a supportive and stable family and network of friends who nonetheless committed a brutal, premeditated murder and covered it up.

¶43. Although the dissent asserts that "[t]o ignore an expert finding regarding Shoemake's incorrigibility completely frustrates the intent of *Miller*," we do not find that this is the case. We recognize that the record reflects that Shoemake presented evidence asserting that there exists the possibility that he may be rehabilitated. This evidence was considered by the trial court. As we addressed above, however, the analysis does not turn solely upon this factor. In both *Miller* and *Parker*, the U.S. Supreme Court and the Mississippi Supreme Court, respectively, both consider rehabilitation as one of several factors to apply in determining whether LWOP should be imposed on a juvenile offender. *Miller*, 567 U.S. at 477-78; *Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26). In neither case is the potential for rehabilitation dispositive, or even given more weight in the sentencing analysis. Further, as we discuss in more detail below, focusing on whether an *offender* is "permanently incorrigible" does not comport with the U.S. Supreme Court's recognition in both *Miller* and

20

*Montgomery* that the proper focus is whether LWOP may be appropriate for juvenile homicide offenders "whose *crime* reflects irreparable corruption." *Miller*, 567 U.S. at 479-80 (emphasis added); *see Montgomery*, 136 S. Ct. at 734. That determination, we find, requires an analysis of all the *Miller* factors. *Miller*, 567 U.S. at 479-80; *Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26). In short, we find that the trial court satisfied its obligation under *Miller* and *Parker* and thus we cannot say it abused its discretion in sentencing Shoemake to LWOP. *Chandler*, 242 So. 3d at 70-71 (¶22).

¶44. We also find no error in the post-conviction court's determination that, having found that the trial court applied the correct legal standard, it was not obligated to conduct a de novo review with respect to the *Miller* factors. As the post-conviction court observed in its order, the issues raised by Shoemake in his PCR motion were "purely legal" issues that did not require an evidentiary hearing. We agree. Although the evidence attached to Shoemake's PCR motion provided additional support for the "possibility of rehabilitation" *Miller* factor, that factor is just one of five *Miller* factors. This evidence does not change the legal standard that the trial court was obligated to consider in determining whether Shoemake's actions justified imposition of a LWOP sentence.

## II.    Permanent Incorrigibility[9]

_____

[9] Shoemake also asserts in a footnote in his brief that the Court must vacate his sentence because it was imposed by a judge, in violation of his constitutional right to have a jury consider the *Miller* factors at his sentencing hearing. The assertion that a juvenile defendant has a constitutional right to be resentenced by a jury has been repeatedly rejected by this Court, and we find no basis for a contrary holding with respect to the initial (and only) sentencing in this case. *Cook v. State*, 242 So. 3d 865, 876 (¶40) (Miss. Ct. App. 2017) ("Unless the United States Supreme Court's opinions in *Miller* and *Montgomery* do not mean what they specifically say—that a judge may sentence the offender to

¶45. Shoemake asserts that his sentence should be vacated and remanded for resentencing because the trial court did not make a finding that he is permanently incorrigible, which Shoemake asserts is required under *Miller*, as "clarified" by *Montgomery*. Because this contention also involves the legal standard applicable in a *Miller* determination, we review this issue de novo. *Chandler*, 242 So. 3d at 68 (¶7). We reject this contention for the following reasons.

¶46. First, Shoemake's focus on whether *the offender* is "permanently incorrigible" or "irreparably corrupt" is misdirected. In *Miller* the Supreme Court recognized that LWOP may be appropriate for juvenile homicide offenders "whose *crime* reflects irreparable corruption." *Miller*, 567 U.S. at 479-80 (emphasis added). Similarly, in *Montgomery* the Supreme Court observed that "*Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose *crime* reflects irreparable corruption . . . [as compared to the offender] whose *crimes* reflect the transient immaturity of youth." *Montgomery*, 136 S. Ct. at 734 (emphasis added) (internal citation and quotation marks omitted). Whether an offender's crime reflects "irreparable corruption" vs. "the transient immaturity of youth" encompasses an analysis of all the *Miller* factors. *Miller*, 567 U.S. at

LWOP—Cook does not have a constitutional right to be resentenced by a jury."), *cert. denied*, 237 So. 3d 1269 (Miss. 2018), *cert. denied*, 139 S. Ct. 787 (U.S. Jan. 7, 2019); *McGilberry v. State*, No. 2017-KA-00716-COA, 2019 WL 192345, at *4 (¶13) (Miss. Ct. App. Jan. 15, 2019), *cert. granted*, 276 So. 3d 659 (Miss. Aug. 29, 2019); *Wharton v. State*, No. 2017-CA-00441-COA, 2018 WL 4708220, at *6 (¶21) (Miss. Ct. App. Oct. 2, 2018), *cert. granted*, 272 So. 3d 131 (Miss. June 27, 2019); *Jones v. State*, No. 2015-KA-00899-COA, 2017 WL 6387457, at *4 (¶15) (Miss. Ct. App. Dec. 14, 2017), *cert. granted*, 250 So. 3d 1269 (Miss. Aug. 2, 2018), *cert. dismissed*, 2015-CT-00899-SCT (Nov. 29, 2018), *cert. pending*, No. 18-1259 (U.S. March 29, 2019).

479-80; *Parker*, 119 So. 3d at 995-96 (¶19), 998 (¶26). The trial court in Shoemake's case expressly recognized this principle in its sentencing order when it stated that it must determine whether the action of the juvenile, applying the applicable factors, constitutes "transient immaturity" or "irreparable corruption." *Miller*, 567 U.S. at 479-80. As we held above, the trial court used and applied the correct legal standard.

¶47. Second, to the extent Shoemake argues that his sentence must be vacated because the trial court did not expressly find that *he* was "permanently incorrigible," we find that there is no such requirement under Mississippi law. In *Chandler*, the Mississippi Supreme Court expressly held that "[t]he *Montgomery* Court confirmed that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." *Chandler*, 242 So. 3d at 69 (¶15); *see Wharton*, 2018 WL 4708220, at *3 (¶11) (citing cases). This contention is without merit.

### III. Categorical Ban on Sentencing Juveniles to LWOP

¶48. Shoemake asks this Court to impose a categorical ban on sentencing juveniles to LWOP because such a practice constitutes cruel and unusual punishment in violation of the Eighth Amendment of United States Constitution[10] and Article 3, Section 28 of the Mississippi Constitution.[11] "Constitutional issues are reviewed de novo." *Jenkins v. State*, 102 So. 3d 1063, 1065 (¶7) (Miss. 2012).

¶49. The United States Supreme Court, the Mississippi Supreme Court, and this Court have

---

[10] U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[11] Miss. Const. art. 3, § 28 ("Cruel or unusual punishment shall not be inflicted.").

23

all declined to recognize such a categorical ban, and we see no basis for distinguishing those cases here. In *Miller*, 567 U.S. at 479, the U.S. Supreme Court held that the Eighth Amendment prohibits mandatory LWOP sentences for juvenile homicide offenders. The Supreme Court recognized, however, that its decision did not "foreclose a sentencer's ability to make that judgment in homicide cases, [so long as the sentencer takes] . . . into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. In *Montgomery*, 136 S. Ct. at 733, the U.S. Supreme Court again recognized that a LWOP sentence remained available in the "uncommon" case where it was found justified.

¶50. In *Jones*, 122 So. 3d at 702 (¶12), the Mississippi Supreme Court found that "*Miller* rendered our present sentencing scheme unconstitutional if, and only if, the sentencing authority fails to take into account characteristics and circumstances unique to juveniles." In *Parker*, 119 So. 3d at 995 (¶19), the Mississippi Supreme Court recognized that "*Miller* does not prohibit sentences of life[-]without[-]parole for juvenile offenders." This Court has also recognized that a juvenile homicide offender does not have "an absolute constitutional right to be considered for parole." *Cook*, 242 So. 3d at 878 (¶45); *Jones*, 2017 WL 6387457, at *4 (¶15). In accordance with this precedent, we likewise decline to hold that a juvenile who has pleaded guilty to murder has "an absolute constitutional right to be considered for parole," *Cook*, 242 So. 3d at 877-78 (¶45), and we find no error in the post-conviction court likewise refusing to do so.

¶51. **AFFIRMED.**

24

**BARNES, C.J., J. WILSON, P.J., GREENLEE, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; LAWRENCE AND McCARTY, JJ., JOIN IN PART.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶52.    The majority finds that the trial court considered the factors in accordance with *Miller v. Alabama*, 576 U.S. 460, 477-78 (2012), and *Parker v. State*, 119 So. 3d. 987, 995-96 (¶19), 998 (¶26) (Miss. 2013).  While this is true, I am of the opinion that the trial court's analysis of the factors failed to give sufficient consideration to the opinions of the forensic psychology experts regarding whether Shoemake is permanently incorrigible.  Therefore, I respectfully dissent in part.

¶53.    At the time of his offense, Shoemake was a seventeen-year-old high school student on the brink of graduation.  With an ACT score of 25, Shoemake had been accepted into several institutions of higher learning and was deemed "college ready" by his high school principal. Both psychology experts interviewed various collateral sources, including Shoemake's family, friends, teachers, counselor, and employer.  Shoemake was described as polite and respectful with loving and supportive parents.  He was a "typical" teenager as the trial court pointed out in its order.  Throughout high school, Shoemake maintained good grades and held down a part time job. Even facing his current legal troubles, Shoemake continued his educational pursuits and still managed to graduate from high school by completing his exams while in custody.  Shoemake pled guilty to the crime and showed contrition.  By taking responsibility for his actions, Shoemake has exhibited some level of

25

maturity. Prior to the current case, Shoemake had no record of involvement with law enforcement or history of behavior issues and has not been cited for any infractions while in MDOC's custody.

¶54. The majority cites the Mississippi Supreme Court's ruling in *Chandler v. State*, 242 So. 3d 65, 69 (¶15) (Miss. 2018), which interpreted *Montgomery* not to require that sentencing courts make a finding of permanent incorrigibility. Quoting Chief Justice Waller's dissent, I would agree that "[c]onsideration of the defendant's capacity for rehabilitation is a crucial step in the *Miller* analysis, because a life without parole sentence reflects an irrevocable judgement about [an offender's] value and place in society, at odds with a child's capacity for change." *Id.* at 71 (¶26) (quoting *Miller*, 567 U.S. at 473) (internal quotation marks omitted). While *Chandler* does not require sentencing courts to make a specific finding of permanent incorrigibility, a blind spot is presented in the case sub judice. The trial court here did not have the "clairvoyance to know if Shoemake [could], in fact, be rehabilitated," but psychology experts would seem likely candidates for the task. After an in-depth evaluation and screening, the State's expert, Dr. W. Criss Lott, expressly found that Shoemake does not belong to the "rare" and "uncommon" group of "irredeemably incorrigible" juveniles warranting the life-without-parole sentence (LWOP). Dr. Lott's opinion was consistent with that of Shoemake's expert, Dr. Steinberg.

¶55. When discussing *Miller*, the Supreme Court of the United States

> recognized that a sentencer might encounter the *rare* juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of children's diminished culpability and heightened capacity for change, *Miller* made clear that appropriate occasions

for sentencing juveniles to this harshest possible penalty will be *uncommon*.

*Montgomery v. Louisiana*, 136 S. Ct. 718, 733-34 (2016) (emphasis added) (internal quotation marks omitted).

¶56.    In *Montgomery*, the U.S. Supreme Court provides an analysis of *Miller*'s independent procedural and substantive components, explaining that "[t]he [*Miller*] hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735. Shoemake, in the opinion of both psychology experts, is one of those children.

¶57.    In its sentencing order, the trial court referenced Dr. Lott's testimony that Shoemake is "not a Ted Bundy," stating that Dr. Lott's statement only "moves [Shoemake] from comparison to one of history's most heinous serial killers," rightfully giving it little regard as a basis for a positive rehabilitative outlook.  At the request of Shoemake's appellate counsel, Dr. Lott, the State's expert, submitted a supplemental affidavit to further clarify his "Ted Bundy" comparison.  In his subsequent affidavit, Dr. Lott explained that Shoemake "*does not appear to be one of those 'rare' and 'uncommon' juvenile offenders who are incapable of being rehabilitated and thus are irredeemably incorrigible.*" Dr. Lott also testified as a forensic psychology expert in *Cook v. State* 242 So. 3d 865, 871-72 (¶¶18-19) (Miss. Ct. App. 2017), and wavered over whether Cook was one of the "rare" offenders contemplated by *Miller*.  However, with regard to Shoemake, Dr. Lott is notably more absolute that "successful reintegration into society" is likely to occur given Shoemake's "intellectual capacity" and "family support."  Shoemake's expert, Dr. Steinberg, echoed Dr.

27

Lott and stated that Shoemake's rehabilitation was "probable."  Even the State's attorney recognized that the *possibility of rehabilitation weighed in Shoemake's favor* during arguments before this Court:

| | |
|---|---|
| The Court: | Does the State have any examples of the rare case or what would be considered the rare juvenile that's incapable of rehabilitation. |
| State's Attorney: | Your Honor, not at this time. I think we are taking it on a case by case basis, just, just as y'all are. |
| The Court: | And you don't believe that Mr. Dalton Shoemake would apply? |
| State's Attorney: | [to the Court] I think that the possibility of rehabilitation may fall in his [Dalton Shoemake's] favor but I don't think that it weighs heavily . . . |
| The Court: | You're conceding that the possibility of rehabilitation falls in his favor? |
| State's Attorney: | I would say that it weighs slightly in his favor. I'm not conceding that it's in his favor. But I would say that the trial court found that it cuts against him. |

The trial court's decision to turn a deaf ear to both experts and its own advocate makes little sense and does not comport with the intent of *Miller* or *Montgomery*.

¶58.    Admittedly, the U.S. Supreme Court did not establish a specific procedure for the application of *Miller*, and the current Mississippi precedent does not require sentencing courts to make an on-the-record finding of permanent incorrigibility. In *Montgomery*, the U.S. Supreme Court explained its intentional and

careful [limit to] the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems. . . .  'We leave to the States the task of

28

developing appropriate ways to enforce the constitutional restriction upon their execution of sentences[.]' Fidelity to this important principle of federalism, however, should not be construed to demean the substantive character of the federal right at issue.

*Montgomery*, 136 S. Ct. at 735 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

Although *Miller* and its progeny have not "impose[d] a formal fact finding requirement," States are not "free to sentence a child whose crime reflects transient immaturity to life without parole [LWOP]." *Id.* "[S]entencer[s] must have the 'discretion' to 'consider mitigating circumstances' before a sentence of [LWOP] may be imposed." *Cook*, 242 So. 3d at 870 (¶9) (quoting *Miller*, 132 S. Ct. at 2475). The Mississippi Court of Appeals went on to say that the decision in *Montgomery* "clarified or expanded" *Miller's* holding: "[A] sentence of LWOP is valid only for 'those rare children whose crimes reflect irreparable corruption.'" *Cook*, 242 So. 3d at 870 (¶9) (quoting *Montgomery*, 136 S. Ct. at 734).

¶59.    A brief look at Mississippi's appellate history with *Miller* reveals that a procedural implementation of *Miller* was never a task the Mississippi Supreme Court sought to undertake. Instead, consistent with the U.S. Supreme Court in *Miller* and *Montgomery*, the Mississippi Supreme Court addressed the *Miller* mandate with a "minimal amount of instruction and intrusion into legislative prerogative . . . ." *Parker v. State*, 119 So. 3d 987, 998 (¶25) (Miss. 2013). The Mississippi Supreme Court expressly called its decision in *Parker* a "stopgap measure" to provide trial courts with some measure of guidance until such time as the Mississippi Legislature reviewed the applicable statutes and implemented necessary changes consistent with *Miller*. *Id.*

¶60.    Six sessions post *Parker*, the Mississippi Legislature has yet to "ameliorate [the

Court's] temporary but required solution," *id.*, and as a consequence, lawmakers' inactions have engendered the current stream of litigation over inconsistencies in the application of *Miller* in Mississippi courts and the resultant impact on judicial efficiency. Without clear legislation or standards for differentiating the "rare" and "uncommon" juvenile offenders from those who have succumbed to "transient immaturity" but are capable of rehabilitation, it is nearly impossible to ensure effective and uniform adherence to the "substantive guarantee" set forth by *Miller*. *Montgomery*, 136 S. Ct. at 735.

¶61. Here, the Court's majority disregards the opinion of the State's own respected and longstanding psychology expert, Dr. Lott, with little regard or deference afforded to his findings. Without conflict, Dr. Lott and Shoemake's psychology expert, Dr. Steinburg, opined that despite the crime Shoemake committed, he is not permanently incorrigible. The trial court determined Dr. Lott was a qualified expert, and the trial court accepted his opinion regarding Shoemake's competency to stand trial but not with regard to Shoemake's rehabilitative capacity—perhaps the most significant and telling factor of the *Miller* analysis.

¶62. Contrary to the majority's assertion, *Miller*'s purpose is not simply to consider factors. During oral argument before this Court, the State explained how the U.S. Supreme Court in "*Montgomery* stated multiple times that it's got to be the rare and uncommon juvenile offender who is irreparably corrupt or permanently incorrigible. But that's what these factors determine . . . ." I would agree. The factors serve as a means to an end—granting juvenile offenders, like Shoemake, "the opportunity to show [their] crime did not reflect irreparable corruption . . . ." *Id.* at 734. Absent irreparable corruption, these individuals are not granted

30

their freedom by any stretch, but they are eligible for "some meaningful opportunity to obtain release based on *demonstrated maturity and rehabilitation*[.]" *Miller*, 132 S. Ct. at 2469 (emphasis added). To ignore an expert finding regarding Shoemake's incorrigibility completely frustrates the intent of *Miller* and was an abuse of discretion.

¶63. Yes—the trial court performed an analysis under the relevant factors, but its ruling was contrary to the finding of the defendant's and State's respective experts: that Shoemake is not permanently incorrigible or incapable of rehabilitation. Therefore, I would find that the trial court's consideration of the *Miller* factors in the case at bar was contradictory to the purpose and focus of *Miller* and *Montgomery*. I dissent in part with the majority's opinion and would find error in the trial court's sentence of LWOP and the subsequent denial of Shoemake's motion for post-conviction relief.

**McDONALD, J., JOINS THIS OPINION. LAWRENCE AND McCARTY, JJ., JOIN THIS OPINION IN PART.**